The next and last case on our argument is Betty v. PepsiCo, Betty, Inc. Good morning. May it please the court, my name is Mark Gregory and I have the honor of representing the appellant Betty, Inc. today. When deciding a motion for summary judgment, the district court is the non-moving party. Far from doing so here, Judge Bracetti made multiple factual inferences against Betty that were pivotal to his decision on both of the claims. With respect to the breach of contract claim, the inferences the district court made rest on a fundamental misunderstanding of the advertising industry's developmental process. The district court viewed the making of a statement of work, or SOW, as being necessary to supply the material terms needed for an enforceable contract to exist. While Judge Bracetti is correct to the extent of holding that the creative agency services agreement together with an SOW does indeed create a binding contract, there was never any SOW in this case, was there? That is correct. The error is in reasoning that having an SOW represented the only way the agreement imposed binding contract obligations. New York is very tough. Contracts to make contracts can exist, but New York is very uncertain about the degree of agreement on any number of things before it will hold one of these contracts to make contracts to be binding. I've had just hundreds of cases of that sort, and it's very unusual that they'll find under New York law that there is enough. I agree that the SOW is binding. Certainly, because the agreement obliged Betty to do certain things, to maintain confidentiality, to not work with PepsiCo competitors, even in the absence of an SOW, we do have a binding agreement to that extent. How is PepsiCo bound if no SOW is made as to a particular assignment? The record indicates that SOWs are made with PepsiCo only after a particular pitch concept was selected and before any meaningful executional details or actual production began. The SOW does not come first in the sequence. But here, your pitch was rejected, wasn't it? Well, our pitch was rejected, but that does not mean that PepsiCo suddenly then acquires the indicia of ownership to be able to use the contract. That's a different question. Yes, that's the issue of the degree of similarity between your pitch and the ultimate act. On the contract, the fact that the SOW comes after, that may be, but that doesn't mean that you have a contract to make a contract before. I'm sorry, I missed the last of what you said, Your Honor. The fact that normally certain things which are needed to make a contract be valid comes after something doesn't mean that there is one before. Well, you have binding obligations on both of the parties here. And if, in fact, what happens in the sequence of events with the advertising industry is that pitches are made, what would stop, in the absence of an agreement, what would stop an advertiser like PepsiCo from simply taking important elements of the non-selected pitch and using that to refine and develop? That's the second argument. If they do that, and they do it in a way that violates a copyright, then you have a copyright claim. But how can you say that because no contract is ever made until after something happens, a contract must exist before? It just seems to be a non-separate. Well, the Creative Service Agreement was made before. The Creative Service Agreement between the parties was in place, and it was in place, and Betty and the other agencies rely on the fact that there is this overriding master services arrangement to actually submit the pitches. One can well imagine that this would have industry-wide implications if an advertiser was able to select and use the ideas, expressions, concepts, and the like from one advertiser in order to develop further the pitch from the selected or favored advertiser. They can't do that to the extent that that violates copyright. Well, but what if it does it and makes just enough changes to potentially avoid a copyright claim? They have still used the property of the original. And they have perfect right to do so to the extent that they're not violating copyrights. Well, the essence, I believe, of Section 7 and the implied covenant that goes with Section 7 is that PepsiCo would not use any property belonging to the agency until all payments are made in respect of the property of the agency. So maybe you should turn to the issue of what elements of your pitch that was copyrighted were infringed upon by the ultimate ad. I think that is the heart of this case, isn't it? Well, I think that's certainly a very important part of the case. And I think it's very important that the court realize that when the district court made its evaluation of substantial similarity, and I don't believe that there is any real debate or question as to what the standard in this circuit provides for, Judge Presetti made certain very important inferences against Betty. And one example of that certainly is in his description of the Betty pitch as being dark and gloomy. And I believe that reasonable jurors from a population group and with a different heritage could certainly perceive young adults bonding with song in the setting of a lit trash can as an expression of joy. There is nothing inherently dark or gloomy about the potential music genres. But isn't there a fundamental difference between the dance theme that they used and the singing? Aren't the differences at least even greater than the differences that we held in Williams, the dinosaur case? I mean, this case is really very similar to that. I was on that panel. It seemed to me that there's more to that case than to this, and yet we held up as well. Well, Your Honor, again, I think it's important to note the dramatic and substantial changes that were made in the marketing arms work from its original concept, which had a rotating stage behind a performer who didn't navigate anywhere, whose wardrobe didn't change at all, to something that we had one seamless, continuous shot with a different vibe, wardrobe, musical style, different fashion, and set decor to reflect each room's expression of joy with the doorways serving as the agent of change. And what was unique about Betty's work is that it brought these various purposeful elements and compiled them in a new and unique way. And that is exactly what the final commercial ended up representing. Although Betty's pitch did not involve dance at all, as Judge Calabresi noted. I believe that when you have music, that you have dance. I would say that the panel has... This is Judge Park. I mean, you're asking us to infer dance and joy from the materials themselves, which just describe acoustic guitar, warehouse, fire lit trash cans. I don't think those things follow intuitively from the description and the pitch materials. I think that a reasonable juror could make that conclusion. And I think it's important to look at the history of this case. And obviously, the panel has the copyrighted material. It has the video. And the test ultimately comes down to what an ordinary observer's eyes and senses see and feel as a spontaneous response. And that's the reason why this issue is ordinarily reserved for the jury. Unique reactions can be produced by the same visual stimuli. We have never taken the position, and we don't argue today, that Judge Carus's decision on the motion to dismiss is binding. But what we do say, and nor is any motion to dismiss binding on a summary judgment decision. But what we do say is that decision clearly demonstrates that two different judges viewing the exact same visuals, the pitch and the commercial, have reached different conclusions on substantial similarity. And with that being the case, if two judges have already perceived the degree of similarity between the two works differently, it's fair to surmise that a reasonable juror could likewise view the degree of substantial similarity differently from Judge Bracetti. Counsel, your time has long expired. Thank you, Your Honor. But you've reserved a minute for a rebuttal. We'll hear from PepsiCo. Good morning, Your Honors. Scott Semay with Lerner David on behalf of PepsiCo. I think the panel has a good handle on the law of contract in the state of New York. I will just point out that there was a creative services agreement, which was an original contract. That contract, the defendant admitted that there is no duty to negotiate. Their 30B6 witness on contract admitted it. It's part of the record. It shouldn't really be an issue. To the extent there's a preliminary agreement, there is zero material terms ever negotiated. And under New York law, it's just not feasible. I think this appeal is really about substantial similarity. I think it goes without saying that substantial similarity must be between a copyrighted written work, here Betty's pitch deck, and an allegedly infringing work, here Pepsi's commercial. Verbal comments, supposedly made by Betty, are not relevant to that inquiry. They are not fixed in a tangible medium. Nor are Betty's assertions about what is in the written pitch deck, the copyrighted pages themselves controlled. And I think the court picked up on the fact already that although dance is a fundamental core component of the Pepsi commercial, it's not even mentioned in the Betty pitch. It does have a change of music genres through time. That is the similarity between the two ads, the pitch and the ad. Even looking at it at the most musical genres and changing those things. That's what the Betty pitch said. It was, let's move from acoustic to heavy metal to acapella. What the Betty commercial is about at core is about showcasing dance styles and how those dance styles change between eras, from the 50s to the 80s to present day. It's not a thing about music. Isn't that analogous to heavy metal, acapella, and so on? Don't they represent different ages of singing? No, I don't think they do. Heavy metal is something that occurs now. Acapella is something that occurs now. Acoustic is something that occurs now. You could do all those things in present time. You could do them all in the 80s. Heavy metal didn't occur when I was a kid. That was in another age, I've got to admit. That's definitely a difference because we start in the 50s and that wouldn't have been possible there. But the fundamental principle of copyright law that is really at the core here is that only expression is protected. It's not ideas. It's not seen as fair. Betty really doesn't dispute the highly abstracted nature of the material that it seeks to get a copyright monopoly over. In its opening brief, it tells the court it presented concepts and it explains its approach to concepting is to go with a broad idea that has many different variations. Betty's corrective director said the material that Betty seeks to protect in this case was his, quote, idea broadly, and he was right. Betty doesn't address, much less challenge the court's findings that certain key fundamental components were ideas and seen as fair that are not protectable. Betty doesn't even mention the phrase seen as fair anywhere in its briefs. Instead, they essentially argue for a new broader standard for copyright protection. They say that the advertising industry requires elasticity and that all ideas, all pitches and commercials start with an idea. And they note multiple times, actually, that its meant to cover undisclosed musical expressions. In essence, Betty wants copyright protection over etc. And the district court didn't bite on this and neither should this court. The district court applied decades old precedent to the record before it and apply the right standard to get to the right conclusion. So if I could state Betty's theme, it would seem to be generational change through the ages as depicted in music. And that you're saying is not copyrightable. And in fact, it is the same as the Britney Spears commercial. Absolutely. And I wouldn't even go so far as to agree that they were talking about generationally. What they did is they said, go to a warehouse. And if you look at the first pitch, first page of their pitch, they said, have this thing in a warehouse and you go to the first room. The first room's got a man with an acoustic guitar. Then you go to a second room and the second room's got heavy metal in it. And then you go to a third room and the third room has, you know, you leave the warehouse and you go to the a cappella scene next to the trash lit fire can. None of the things that are arguably expression in there, you know, the Brooklyn like warehouse, the specific versions, the adult like quality of the woman who's the singer, the doo wop a cappella crew. It is undisputed that none of those possible expressions are ever shown in the Pepsi commercial. They're just not there. And Betty relies on the six lines in the second page of its pitch to allege infringement. And what those things are, they're not any form of particularized expression, which is what copyright law protects at all. They provide executional options, things like, well, you don't have to be in a warehouse. Maybe you could use a stage to get the warehouse effect or you don't have to use the multiple performers like the man with the acoustic guitar or the Adele like singer. You could do it with one performer who could be a celebrity or not a celebrity. So pretty much anyone, those things are not protectable. They don't create the protection. What about the jukebox concept of spinning disco record, turning into the Pepsi logo? They seem to argue that that's a piece of it that was utilized in the actual commercial. They do. The jukebox is part of the title in the Betty concept. And what they allege that it is, is a concept, the idea of a living jukebox. And there are other commercials that actually do that. There's a pretty prominent Budweiser commercial that has singers inside of a jukebox moving around and dancing. There are lots of ways to do that concept. That concept, first of all, wasn't adopted. And if it was, it's an idea that is completely unprotectable. The way Pepsi and the way they connected to Pepsi is they say there was a jukebox at the beginning of the Pepsi commercial. That has nothing to do with the concept of the living jukebox. That's the way you get to a 1950s diner scene, which is where they are and the start of the music. And the testimony was indisputed by the author, the creator of this commercial, that the reason he did it is because you have to start music in a diner. And that's the only way to do it. They almost cut the idea because it was so stock. They said it reminded them of happy days. And they finally decided we still have to use it because it's the only way to do it. It is classic, see not fair, if it's not just an idea. Classic and non-copyrightable is what you're arguing. Absolutely. Continue. I guess there's one more argument that I'll address and then I'll conclude. And it's the argument that combinations of things here matter. But he doesn't point to any specific things that are combined to create something protectable that wasn't. And in many ways, this case is kind of like the architecture cases. And this court tackled the same argument and they said, look, it's not enough to say I'm going to combine a park and a tall building and a parking garage. The thing that matters is the particularized expression of those things and those combinations. And here, there's nothing that rises to the level of the example of the Budweiser commercial. And it says, well, geez, the frog plus a lily pad plus a ribbit, those things aren't individually copyrightable. But if you combine them, they are. And I actually don't think they are. But what might be copyrightable and what probably is copyrightable is Budweiser's commercial where they had three frogs sitting on these lily pads. And one of them croaks, Bud. And the other croaks, Wise. And the other croaks, Er. And they make a commercial out of it. And it's that particularized expression that is the only possible thing that is going to be used. And you just don't have that here. Nothing artistic, you know, constituting any kind of expression was used. Thank you, Mr. Gregory. You've retained one minute for rebuttal. Yes, Your Honor. I'm not sure. There we go. Both the Super Bowl commercial and the second produced commercial used doorways as the agent of change for varied musical genres, wardrobes, dance, environment, and the like, as the hero performer navigated from room to room, just as Betty proposed. The agreement did not permit or give PepsiCo the discretion to take one agent's concept, expression, proposed storyline that it would not have received but for the fact of the agreement and the existence of the agreement, and then effectively exercise ownership over it by using it to meaningfully refine and create a derivative work. A fair reading of the material terms of the agreement as a standalone instrument is that PepsiCo would not exercise ownership rights without first engaging in and completing negotiations to rightfully obtain ownership, either with an SOW or some other transfer agreement. No agency would expect any less than that. It's illogical to think that the agreement is binding as to Betty but not as to PepsiCo, yet that is the essence of what the district court has held. It's correct that an SOW would be needed to move ahead for the parties to develop a pitch into a contract, but that fact alone does not preclude there being a duty on the part of PepsiCo to not use Betty's work product for any other purposes, such as to refine the work of another agency. There is ample evidence in the record that would support a jury finding that PepsiCo did just that. Thank you, counsel. Thank you both. Very interesting case. We'll reserve decision. That concludes our argument calendar. I will ask the clerk to adjourn court. Court stands adjourned.